## TRANSCONTINENTAL OIL CO. v. SPENCER et al.

(Circuit Court of Appeals, Fifth Circuit. July 2, 1925.)

No. 4480.

1. Mines and minerals ⬀78(1)—Commencement of well and discovery of gas held to prevent termination of lease, unless lessee failed to prosecute work with diligence.

Under oil and gas lease, *held* that commencement of well within year and discovery of gas thereafter prevented termination of lease without commencement of second well within twelve months, and without further payment, unless lessee failed to prosecute work with diligence, and lessors did not waive the default or estop themselves.

2. Evidence ⬀7—Judicial notice taken that gas cannot be brought to the surface and stored.

Judicial notice may be taken that gas unlike oil cannot be brought to the surface and stored to await a market for it.

3. Mines and minerals ⬀78(5)—Lessors, by not objecting to continued existence of lease, waived right to have it annulled, and by estoppel lost right to deny lease was in force.

Where oil and gas lease required well to be commenced and prosecuted with diligence, to prevent termination of lease, and where in August drilling work was suspended till November, when well was developed as gas well, but lessors, with knowledge of default, raised no objections to continued existence of lease, they waived right to have it annulled, and by estoppel lost right to deny lease was in force when paying gas well was brought in.

Appeal from the District Court of the United States for the Western District of Louisiana; Benjamin C. Dawkins, Judge.

Suit by Mrs. Lula Spencer, individually and as tutrix, and others against the Transcontinental Oil Company. Decree for complainants (2 F. [2d] 273), and defendant appeals. Reversed.

Elmo P. Lee, of Mansfield, La., and W. B. Hamilton, of Shreveport, La. (Thigpen, Herold, Lee & Cousin, of Shreveport, La., on the brief), for appellant.

James Walter Elder, of Farmerville, La. (Elder, Thompson & Digby, of Farmerville, La., on the brief), for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. This was a suit by the appellees against the appellant for the annulment of a lease made by the former to the latter on November 18, 1919, of described land in Union parish, La., containing 480 acres, more or less, "for the sole and only purpose of mining and operating for oil and gas and laying pipe lines and building tanks, power stations and structures thereon to produce, save, and take care of said products." The lease contract showed that it was made for and in consideration of a stated substantial sum, cash in hand paid by the lessee to the lessors, and stipulated "that this lease shall remain in force for the term of five (5) years from the date hereof and as long thereafter as oil or gas or either of them is produced from said land by the lessee." That instrument contained the following:

"If no well be commenced on said lands and prosecuted with due diligence on or before the 18th day of November, 1920, this lease shall terminate as to both parties, unless the lessee, on or before that date shall pay or tender to the lessors, or to the lessors' credit, in the Ouachita National Bank at Monroe, Louisiana, or its successors, which shall continue as a depository, regardless of changes in the ownership of said land the sum of twelve thousand five hundred and no/100 ($12,500.00) dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above-

described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period, which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there has been no interruption in the rental payments. * * * Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing."

The grounds on which the annulment of the lease was sought were: First, that one of the appellees as tutrix of her minor children was not authorized to enter into the lease; and, second, nonperformance by appellant of obligations imposed upon it by the contract. The opinion rendered by the district judge shows that he concluded that the appellees were not entitled to the relief sought on the first-mentioned ground. The correctness of that conclusion has not been questioned in this court. By the decree appealed from the lease mentioned was canceled and annulled, "save and except as to the well and appurtenances completed on November 23, 1921, together with a square of ground of ten acres of which said well shall be the center and as to which the rights of defendant are recognized and ordered enforced under the terms and conditions of the lease." The opinion rendered shows that the decree was the result of the conclusions that the appellant lost the right to further develop the leased property by failing, after salt water was struck on August 14, 1921, under circumstances hereinafter stated, either to complete the undertaking as a gas well or to pay the stipulated rental on or before November 18, 1921, and that equity requires that appellant should not be deprived of the benefit of the gas well brought in by it, as hereinafter stated.

The following statements in the opinion of the district judge were in accordance with evidence adduced: "Some time during the month of September, 1920, a location for a well was made upon the premises, and in October the derrick was built, being completed about the 19th of that month. A few days before the 18th of November, 1920, but just prior to the expiration of the first year of the lease within which the next rental had to be paid to avoid forfeiture, defendant begun drilling with a drill stem and went down 15 feet. Thereafter, although a crew was kept upon the ground, no further drilling was done until about the 12th of December, due, according to the defendant's witnesses, to the fact that they were awaiting arrival of pipe or well casing. Moreover, there is no explanation as to what caused the delay, whether by the shipper, carrier, or defendant in failing to timely order it. On the latter date operations were renewed, and about the middle of March, 1921, gas was struck at a depth of approximately 2,075 feet. The flow was so strong that it blew out the drill stem and wrecked the derrick. But, inasmuch as defendant was trying to find oil, the gas flow was choked off and drilling continued to a depth of 2,563 feet, where salt water was struck on August 14th. Defendant then ceased operations and discharged its crews but left a watchman on the ground for about a week. After that time, and during a period of more than eighty days, nothing further was done, although the machinery and casing appears to have been left on the ground, until about the 10th of November, approximately eight days before the second annual period for the payment of the rent, which would have expired on the 18th of November when the defendant started "plugging back" in the same hole for the purpose of developing a gas well. On November 16th, work of perforating the casing at the gas strata was begun and on Thanksgiving Day, November 23d, the well was completed as a gasser, producing something less than 5,000,000 feet. November 25th, or two days after completion, this suit was filed. Up to that time defendant had expended approximately $40,000 in addition to the original consideration."

A. H. Carter, a witness for appellant, testified to the following effect: At the time the well mentioned was completed as a gas well and prior thereto there were no commercial gas pipe lines in the vicinity of this well handling gas, and there was no market for the gas. There was no market for the gas when it was found. While I do not sell gas, I made inquiries for the company hoping to find a place to sell the gas, but could find none.

T. J. Newlin, another witness for the appellant, testified as follows: "I am employed in the land department of the Transcon-

tinental Oil Company, and have been in that department in the employ of the company for about five years. My duties largely center in buying leases and production and in securing rights of way and finding sales for products produced. In line with this work, I tried to find a market for the gas produced on the Spencer lease. I went to Monroe and took up the proposition of selling this gas in this well with various carbon people. I cannot give the exact date, but it was in 1922. One of the companies I had it up with was the Standard Carbon Company, but I could not find any market for the gas. Several companies refused to buy the gas because the Spencer lease was in litigation. Later I saw several other companies, but all informed me they were not in the market for the gas."

The testimony of the two above-named witnesses was not controverted. A witness for appellees testified that there were no commercial gas pipe lines near this well. One of the appellees who testified in their behalf stated that he had lived on the leased land all his life, that the well mentioned was located about 60 yards from his dwelling house and store, and he was there practically every day while appellant was drilling.

[1] Under the terms of the lease the commencement by the appellant of a well on the leased land before November 18, 1920, had the effect of preventing the termination of the lease on that date or thereafter except in the event of appellant failing to prosecute the work with due diligence. Gas in paying quantity having been discovered in that well before anything occurred which plausibly could be relied on as constituting a failure by the appellant to prosecute the work with due diligence, with the result that that well was not a dry hole, a resumption of the payment of rent or the commencement of a second well within twelve months from the last-mentioned date was not required to keep the lease alive, as the provision in that regard applied only in the event of the first well drilled being a dry hole. By commencing the well as stated, and finding gas therein in apparently paying quantity, the appellant, without paying anything in addition to the original "down payment," preserved its rights as lessee unless it failed to prosecute the work with due diligence, and appellees did not waive their rights based on that default or estop themselves to seek an annulment of the lease because thereof.

[2] What is relied on as a failure by the appellant to prosecute the work with due diligence is its suspension of operations during the period from August 14, 1921, when salt water was struck and hope of finding oil was abandoned, to November 10, 1921, when operations were resumed for the purpose of plugging back the salt water and completing the well as a gas well by perforating the pipe at the gas stratum in the upper sand. Whether that suspension of operations did or did not constitute a failure to prosecute the work with due diligence depends upon the circumstances under which such suspension occurred. A temporary suspension of operations may not be inconsistent with the exercise of due diligence, where it occurs under circumstances warranting the inference that a continuance of operations would not be of benefit or profit to parties in interest. Gypsy Oil Co. v. Cover, 78 Okl. 158, 189 P. 540, 11 A. L. R. 129, 137. That the suspension of operations was unaccompanied by any intention on appellant's part to abandon the enterprise or terminate the lease may be inferred from the fact that it left its equipment on the premises, and did not exercise the right given to it by the lease to draw and remove the casing in the well. Support for the conclusion that the suspension of operations was consistent with the exercise of due diligence in prosecuting the work was furnished by the evidence to the effect that during the period of suspension there was no market for the gas in the well and no commercial pipe line through which it could be carried, by the fact, of which judicial notice may be taken, that gas, unlike oil, cannot be brought to the surface and stored to await a market for it, and by the absence of evidence showing that either the lessor or the lessee would have been benefited by the well being completed as a gas well in August instead of in the following November. It well might be inferred that the lessee was not at fault in failing to extract gas at a time when there was no opportunity to dispose of it profitably.

[3] But, even if lessee's delay in completing the well as a gas well after the disclosure that it would not produce oil constituted a failure to prosecute the work with due diligence, such default of the lessee did not itself terminate the lease, but merely gave the lessors a waivable option to cancel. Hanley Falls Creamery Co. v. Milton Dairy Co., 126 Minn. 226, 148 N. W. 46, 52 L. R. A. (N. S.) 718; Note to Evans v. Consumers' Gas Co., 31 L. R. A. 673; Cesar v. Virgin, 207 Ala. 148, 92 So. 406, 24 A. L. R. 715. The provision was for the benefit of the lessors, and could be availed of or not as they chose. The evidence disclosed that

at least one of the appellees, with full knowledge of the suspension of operations, stood by, without raising any question as to the continued existence of the lease and of the lessee's rights thereunder, while the latter resumed operations and prosecuted them until they resulted in the bringing in of a paying gas well. After the lessee acquired a valuable right under the lease by disclosing the existence in the well drilled of gas in paying quantity, it was subject to lose the benefit of its discovery by a noncompliance with the condition subsequent created by the provision which required continued prosecution of the work with due diligence. But the mere occurrence of the lessee's default in that regard did not put an end to its rights under the lease, if a lessor failed to claim the benefit of it with reasonable promptness, or, with knowledge of the default, so conducted himself as to signify his consent to the lease remaining in effect, or to influence the lessee to change its position by proceeding with the work in reliance on the belief, so induced by conduct of the lessor, that the lease remained in force. Howard v. Manning, 79 Okl. 165, 192 P. 358, 12 A. L. R. 819. A lessor is not entitled to occupy the inconsistent position of acquiescing in the lessee going on under the lease, and at the same time retaining the right to rescind for a known breach of a condition by the lessee. Galveston, etc., Co. v. Galveston, H. & S. A. Ry. Co. (D. C.) 284 F. 137; Id. (C. C. A.) 287 F. 1021. We are of opinion that the evidence was such as to require the conclusion that one of the lessors, by consenting, with knowledge of a default, to the continued existence of the lease, waived the right to have it annulled because of the lessee's failure to prosecute the work with due diligence, and also by estoppel lost the right to deny that the lease was in force when the paying gas well was brought in by the lessee. It follows that the decree appealed from was erroneous.

That decree is reversed.